Slip-Op. 00-145

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
**UGINE-SAVOIE IMPHY, UGINE STAINLESS**   :
**AND ALLOYS, INC., AND TECHALLOY, INC.,** :
                                          :
           **Plaintiffs,**  :
                                          :
    **v.**                                 :
                                          :
**UNITED STATES,**                        :
                                          :  **Court No: 00-08-00423**
          **Defendant,**   :
                                          :
    **and**                                :
                                          :
**CARPENTER TECHNOLOGY, EMPIRE**          :
**SPECIALTY STEEL, UNITED STEELWORKERS**  :
**OF AMERICA (AFL-CIO/CLC),**             :
                                          :
       **Defendant Intervenors.**  :
                                          :
_____:


[Plaintiffs' motion for preliminary injunction is granted.]


    *Weil, Gotshal & Manges* (Stuart M. Rosen, Gregory Husisian), New York, NY, for Plaintiffs.

    *Collier, Shannon, Scott* (Laurence J. Lasoff, Kathleen Cannon), Washington, D.C., for Defendant-Intervenors.

**MEMORANDUM OPINION**

**CARMAN, Chief Judge:**

Plaintiffs move for a preliminary injunction following a finding by the United States International Trade Commission (ITC) after a five year sunset review that revocation of antidumping orders on stainless steel wire rod from France would likely lead to a recurrence of material injury to the United States domestic industry within a reasonably foreseeable time. Plaintiffs seek to enjoin the United States from issuing instructions to liquidate or from liquidating any and all unliquidated entries of stainless steel wire rod from France produced by the Plaintiffs and entered or withdrawn from warehouse for consumption after January 1, 2000 until the lawsuit commenced by the Plaintiffs challenging the ITC's sunset review determination receives final judicial review. The United States consents to the issuance of a preliminary injunction. Defendant-Intervenors object.

**BACKGROUND**

On July 1, 1999, the ITC initiated a five year review pursuant to section 751(c) of the Tariff Act of 1930, as amended by 19 U.S.C. §1675(c) (hereinafter, sunset review). *See Stainless Steel Wire Rod From Brazil, France, India, and Spain*, 64 Fed. Reg. 35697 (July 1, 1999). This review was conducted to determine whether revocation of the countervailing duty and antidumping duty orders on stainless steel wire rod from Brazil, France, India, and Spain would likely lead to continuation or recurrence of material injury within a reasonably foreseeable time. On October 15, 1999, the ITC determined that it would conduct a full review pursuant to the sunset law's provisions. On July 21, 2000, the ITC published notice of its final

determination, finding in part that revocation of the antidumping duty orders on stainless steel wire rod from France would likely lead to a continuation or recurrence of material injury to the United States domestic industry within a reasonably foreseeable time. *See Stainless Steel Wire Rod From Brazil, France, India, and Spain*, 65 Fed. Reg. 45409, 45409 (July 21, 2000).

On September 20, 2000, Plaintiffs timely filed a complaint with this Court challenging the ITC's final sunset review determination. On October 20, 2000, Plaintiffs filed this motion for preliminary injunction seeking to enjoin liquidation of all unliquidated entries of subject merchandise produced by the Plaintiffs and entered or withdrawn from warehouse for consumption after January 1, 2000. [1]

Prior to the Uruguay Round, the antidumping laws did not effectively restrict the duration of an antidumping order. Antidumping duties were imposed for as long as dumping or injury continued, subject only to the possibility of yearly administrative reviews establishing the applicable antidumping duty rate. The law, however, did provide that Commerce could revoke an antidumping order if there were no request for an administrative review of that order for four consecutive years. *See* 19 C.F.R. § 353.25 (1994). This provision, however, was infrequently used. [2]

---

[1] Commerce has issued a regulation establishing January 1, 2000 as the effective date of a revocation or termination of a transition order prior to or as a result of the initial sunset review. *See* 19 C.F.R. §351.222(i)(2)(ii). Transition orders are defined by 19 U.S.C. §1675(c)(6)(C), in relevant part, as "an antidumping duty order under this subtitle or a finding under the Antidumping Act of 1921… which is in effect on the date the WTO Agreement enters into force with respect to the United States, if such order is based on an investigation conducted by both the administering authority and the Commission." The antidumping duty order at issue in this case was originally issued in 1992 and, therefore, was in effect on the date the WTO Agreement entered into force. Although the antidumping order has been in place for eight years 19 U.S.C. §1675(c) has only been in effect since 1995 and, thus, only one sunset review has been performed. As such, the subject matter of this litigation is within the purview of 19 C.F.R. §351.222(i)(2)(ii).

[2] The Court notes two distinguished scholars have found that between January 1, 1980 and July 31, 1994 a total of 533 antidumping and countervailing duty orders were placed in effect. During the same period, however, only 162 orders (30.39%) were revoked. During this period, the average length of time a revoked duty order remained in effect was 8.28 years. *See* Raj Bhala & Anthony Kennedy, WORLD TRADE LAW at 628.

With the passage of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (Dec. 8, 1994), Commerce's regulations and the Trade Agreements Act of 1979 were amended to provide several methods by which an antidumping order could be terminated or revoked. An antidumping order may be revoked where Commerce determines that "[a]ll exporters and producers covered at the time of revocation by the order… have sold the subject merchandise at not less than normal value for a period of at least three consecutive years" and "[I]t is not likely that those persons will in the future sell the subject merchandise at less than normal value." 19 C.F.R. §351.222(b)(1)(i)-(ii) (1998). An antidumping order may also be revoked where either the circumstances surrounding the order have changed sufficiently to warrant revocation or where the producers accounting for substantially all of the production of the relevant domestic like product express a lack of interest in the continuation of the order. *See* 19 U.S.C. §1675(b); 19 C.F.R. §351.222(g) (1998).

Most relevant to this case, however, an antidumping order may be revoked or terminated by Commerce or the ITC through the sunset review process. *See* 19 U.S.C. §1675(c). This process requires Commerce and the ITC to invite interested parties to provide information pertaining to the impact that revocation of the antidumping order would have on the relevant domestic industry. *See* 19 U.S.C. §1675(c)(2). If this information is provided, it is then used to aid Commerce in determining whether the revocation of the antidumping order would likely lead to "a continuation or recurrence of sales of the subject merchandise at less than fair value." 19 U.S.C. §1675a(c)(1). The ITC similarly uses this information when determining whether revocation of the same order would likely lead to "continuation or recurrence of material injury within a reasonably foreseeable time" 19 U.S.C. §1675a(a)(1). If Commerce and the ITC make affirmative determinations, the antidumping orders are to remain in effect for an additional five

years, subject to yearly administrative reviews.  Under the sunset review procedures, this process is to repeat until either Commerce determines that there is no threat of continued or recurring dumping or the ITC determines that there will likely not be a continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time.  *See* 19 U.S.C. §1675(c)(1)(C).  Where, however, no interested parties submit information regarding the effect of revocation on the domestic industry, the antidumping duty order is automatically terminated. *See* 19 U.S.C. §1675(c)(3)(A).

## DISCUSSION

The Court has jurisdiction over Plaintiffs' underlying litigation pursuant to 19 U.S.C. §1581(c) and sections 516A(a)(2)(A)(i)(I) and (B)(iii) of the Tariff Act of 1930, as amended by 19 U.S.C. §§1516a(a)(2)(A)(i)(I) and (B)(iii) (1999).  Plaintiffs' motion for preliminary injunction is properly before this Court pursuant to 19 U.S.C. §1516a(c) (1994).

The facts before this Court are undisputed.  On July 21, pursuant to a five-year sunset review, the ITC published notice of its final determination that antidumping duty orders on stainless steel wire rod from France were to continue due to the likelihood that revocation would lead to continued material injury to the United States domestic industry.  Plaintiffs challenge this determination and, now, seek a preliminary injunction enjoining the United States from liquidating any and all entries of subject merchandise produced by the Plaintiffs and entered or withdrawn from warehouse for consumption after January 1, 2000.

It is well settled that a preliminary injunction is an extraordinary remedy.  Therefore, before the Plaintiffs can be granted such relief they must establish: (1) in the absence of a preliminary injunction, they will suffer irreparable harm; (2) the balance of hardships tilts in the

movant's favor; (3) there is a likelihood of success on the merits; and (4) the grant of a preliminary injunction is not contrary to public interest. *See NMB Singapore Ltd. v. United States*, No. 00-144, Slip Op., at 7 (CIT, Nov. 3, 2000), *citing, FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). For the reasons stated below, this Court finds that the Plaintiffs have satisfied the four criteria and are, therefore, entitled to preliminary injunctive relief.

> A.       Irreparable Harm

Plaintiffs argue they will suffer immediate and irreparable harm if the unliquidated entries of subject merchandise entered into the United States after January 1, 2000 are liquidated prior to the completion of final judicial review in this case. Specifically, Plaintiffs argue that if they succeed in their legal challenge of the ITC's sunset review determination they will suffer the unrecoverable loss of all antidumping duties paid on the liquidated entries, as well as the negation of their statutory right to effective and meaningful judicial review.

In *NMB Singapore, Ltd. v. United States,* Slip Op., at 9-10, this Court extended the rule established by the United States Court of Appeals for the Federal Circuit (Federal Circuit) in *Zenith Radio Corp. v. United States*, 710 F.2d 806, 810 (Fed. Cir. 1983)[3] to cases challenging an affirmative sunset review determination where the order has continued in force. The *Zenith* court held that "the inability of reviewing courts to meaningfully correct the [administrative] review determination is irreparable injury that must be considered by the trial court…" 710 F.2d at 811. In *NMB Singapore*, this Court held that, when a plaintiff challenges an affirmative sunset

---

[3] In *Zenith Radio Corp. v. United States,* 710 F.2d 806 (Fed. Cir. 1983), the United States Court of Appeals for the Federal Circuit granted plaintiffs a *per se* right to a preliminary injunction enjoining liquidation of unliquidated entries pending final judicial review of administrative review determinations. Defendant-Intervenor acknowledges the *per se* right to a preliminary injunction that attaches in cases challenging an administrative review. *See* Defendant Intervenors' Brief, at 6 ("… injunctive relief for both importers and the domestic industry is now virtually automatic…")

review determination, the potential unrecoverable loss of antidumping duties paid on entries liquidated prior to the entry of final judgment and the attendant negation of a plaintiff's statutory right to meaningful judicial review constitutes irreparable harm. *See NMB Singapore*, Slip Op., at 9. This Court found that "because the antidumping order remains in effect, and because the liquidation of entries is not suspended during the pendancy of the Plaintiffs' legal challenge, the Plaintiffs are faced with potential harm similar to that faced by parties challenging an administrative review determination" and that "absent a preliminary injunction suspending liquidation, judicial review could not provide the Plaintiffs with meaningful relief." *Id.* Therefore, "any judicial remedy would be fruitless." *Id.*

In the present case, the Court is faced with virtually identical facts. The Plaintiffs challenge the continuation of an antidumping order pursuant to an ITC sunset review determination. The Plaintiffs have deposited estimated duties in accordance with the rate established by the last administrative review and will continue to make such deposits during the course of this litigation. If the Plaintiffs are successful in their legal challenge to the ITC's sunset review determination all future entries of subject merchandise will be entered free of antidumping duties. If, however, the United States liquidates entries of subject merchandise prior to final judicial review, the antidumping duties paid on these entries would be unrecoverable and this Court would be stripped of its ability to provide the Plaintiffs with "the only meaningful correction" available to them. *Zenith*, 710 F.2d at 811.

Accordingly, pursuant to the precedent established by *NMB Singapore*, Slip Op., at 9, and the facts of this case, this Court holds that, in the absence of a preliminary injunction, the Plaintiffs would suffer irreparable harm.

    B.      Balance of Hardships

An inquiry into the balance of hardships requires this Court to determine which party will suffer the greatest adverse effects as a result of the grant or denial of the preliminary injunction. The balance of hardships clearly tilts in favor of the Plaintiffs. As stated, if the preliminary injunction is denied, the Plaintiffs would suffer the potential[4] unrecoverable loss of all antidumping duties paid on the liquidated entries and the negation of their statutory right to meaningful judicial review. In contrast, the United States has consented to the grant of the preliminary injunction and, presumably has no complaint if the Plaintiffs' motion is granted.

Defendant-Intervenors oppose Plaintiffs' motion, arguing that the domestic industry would suffer hardship as great or greater than that suffered by the Plaintiffs' if a preliminary injunction is granted. Specifically, Defendant-Intervenors argue that, if the preliminary injunction is granted, the domestic industry will suffer a substantial hardship in the form of lost sales, diminished revenues, suppressed and depressed prices, and increased unemployment as a result of the potential "under-collection" of duties. Domestic-Intervenors urge that the potential hardship facing the domestic industry is "just as serious and just as important as the harm incurred by an importer of record in the potential over-collection of duties." Defendant-Intervenors' Brief at 3. Accordingly, because "equity dictates that the law be applied in the same manner for both the domestic industry and the foreign interests," Defendant-Intervenors argue that the balance of hardship tilts away from the Plaintiffs and away from issuing a preliminary injunction.

---

[4] Defendant-Intervenors acknowledge that the plaintiffs will be unable to recover these duties even if they are successful in their legal challenge. *See* Defendant-Intervenors Brief, at 12 ("… it is true that if plaintiffs prevail in this appeal they cannot recover duties paid on liquidated entries…")

This Court is unpersuaded by Defendant-Intervenors' argument. Defendant-Intervenors' argument rests squarely on the potential harm suffered by the domestic industry as a result of the potential "under-collection" of antidumping duties. This argument, however, mischaracterizes both the nature of the Plaintiffs' motion and the scope of relief that would be available through a preliminary injunction. Contrary to Defendant-Intervenors' assertions, the Plaintiffs are not seeking to enjoin the future deposit of anticipated antidumping duties during the pendancy of this litigation, but solely to enjoin the liquidation of subject merchandise entered in conjunction with those deposits. The United States will continue to collect anticipated antidumping duties in accordance with the rate established at the last administrative review. If Plaintiffs wish to continue exporting to the United States, either Plaintiffs or their US importers will be forced to pay these anticipated duties, thereby eliminating the possibility that duties will be "under-collected."

This Court finds that the balance of hardships clearly favors the Plaintiffs.


C.      Likelihood of Success on the Merits

The moving party is required to demonstrate a likelihood of success on the merits of its case before a preliminary injunction will be issued. Although this requirement is important, it is not determinative and must be balanced against the comparative injuries of the parties. *See Timken Co.*, 569 F. Supp. at 70. This balancing involves an inverse relationship between the level of hardship the moving party will suffer if the preliminary injunction is denied and the standard that must be met to demonstrate a likelihood of success on the merits. The greater the harm to the moving party, the lower the standard will be. *See Id.* Where it is clear that the moving party will suffer substantially greater harm by the denial of the preliminary injunction

than the non-moving party would by its grant, it will ordinarily be sufficient that the movant has raised "serious, substantial, difficult and doubtful" questions that are the proper subject of litigation. *PG Industries*, 11 CIT at 8; *See Floral Trade Council*, 17 CIT 1022, 1023 (1993).

The Plaintiffs generally challenge the ITC's final determination that the removal of antidumping orders on stainless steel wire rod from France would have an adverse affect on the United States domestic industry. Specifically, Plaintiffs challenge the ITC's determination that removal of these orders would have the effect of substantially depressing the price of the domestic like product, and thereby continue the material injury suffered by the United States domestic industry. Finally, Plaintiffs challenge the ITC's decision to cumulate stainless steel wire rod imports from France with imports from Brazil and India, and the resulting conclusion that these imports would likely cause continuing material injury to the United States domestic industry. On each count, Plaintiffs argue that the ITC's decision was unsupported by substantial evidence and was otherwise not in accordance with law.

Because the Plaintiffs have shown that, in the absence of a preliminary injunction, they would suffer irreparable harm, they are required only to raise "serious, substantial, difficult and doubtful" questions to satisfy their burden of proving a likelihood of success on the merits. On the papers before this Court, it is clear that the Plaintiffs have met this burden. The Plaintiffs have raised issues that are "serious, substantial, difficult and doubtful" and, thereby, are legitimate grounds for litigation.

This Court finds that the Plaintiffs have raised sufficiently serious legal questions to warrant granting their motion for preliminary injunction.

D.      Public Interest

The final factor that this Court must consider is whether the granting of a preliminary injunction is consistent with public interest.  It is well settled that the public interest is served by "ensuring that the ITA complies with the law, and interprets and applies [the] international trade statutes uniformly and fairly."  *See PG Industries*, 11 CIT at 9, *quoting*, *Ceramica Regiomontana v. United States*, 590 F. Supp. 1260, 1265 (CIT 1984).  Similarly, the public interest is served by preserving the Plaintiffs' right to meaningful judicial review.  *See  NMB Singapore,* Slip Op. at 12.

This Court finds that the public interest is best served by granting the preliminary injunction.

## CONCLUSION

For the above stated reasons, this Court is persuaded that the Plaintiffs have satisfied the judicially established prerequisites for obtaining a preliminary injunction.  Accordingly, Plaintiffs motion is hereby GRANTED.

_____
Gregory W. Carman,
Chief Judge

Dated: November _____, 2000
          New York, NY